# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DAVID ALAN GILES, also known as DAVID
ALAN JILES, also known as JAMES TONEY,

      Defendant-Appellant.

UNPUBLISHED
November 8, 2016

No. 328046
Wayne Circuit Court
LC No. 14-011032-02-FH

Before: WILDER, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

A jury convicted defendant of possession with intent to deliver marijuana, MCL 333.7401(2)(d)(*iii*). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 40 months to 15 years in prison. Defendant now appeals as of right, asserting errors in the admission of testimony regarding business records of a telephone call he made and in the scoring of prior record variable (PRV) 5. We affirm his conviction, but remand for resentencing.

## I. FACTUAL BACKGROUND

Defendant's conviction arises out of the search of a house following reports and surveillance of narcotics activity in the fall of 2014, at 18590 Elkhart, in Harper Woods. On November 3, 2014, the police observed defendant carry garbage from this house to the curb at the street. The police recovered a small amount of marijuana during a search of the garbage. Over the next two weeks, defendant was again seen going in and out of the house. On November 17, 2014, the police found more marijuana and small plastic Ziploc bags—commonly used in narcotics trafficking for "dime bags"—inside the garbage at the Elkhart house.

On the morning of November 18, 2014, Monique Washington purchased a "nickel bag" of marijuana from defendant at the Elkhart house. That same morning, Detective-Lieutenant Ted Stager saw defendant conduct two hand-to-hand transactions, one in front of the house and one at the front door of the home, both of which were consistent with a narcotics sale. Later that morning, the police executed a search warrant at the house. The team knocked and announced its presence, but received no response, so the members forced their way inside. Within two seconds of their entry, defendant dove out of a bedroom window, ignored police commands, and

-1-

attempted to flee. After a short foot chase, defendant was arrested, but continued to struggle with the officers.

During the search of the house, the police recovered four "dime bags" of marijuana from a table in plain view in the front living room. A digital scale was on a kitchen chair next to the table. A table in front of a couch held additional marijuana, a bag containing four Ziploc bags of marijuana, empty Ziploc bags, and a "suspected crack rock." The bag containing the four Ziploc bags of marijuana had a fingerprint that matched the impression from defendant's left, middle finger. A loaded handgun was found underneath the cushion of a loveseat, and a cell phone with pictures of defendant, marijuana, and handguns was charging on the arm of the same loveseat.

The house was dirty and contained papers and miscellaneous items scattered throughout. A red tote bag on the couch in the front room contained a casino card for a codefendant, Chaz Harris, along with suspected cocaine, a scale, and 16 empty one-inch by one-inch Ziploc bags. The police recovered a traffic citation for another man. Nothing was recovered with defendant's name or address on it.

At trial, Kristine Pauli, the director of operations for a property management company, testified that the Elkhart house was purchased in September 2014, and her company managed the property afterward. According to Pauli, nobody was renting the home, but her search of the company's computer system revealed that defendant had called on September 22, 2014, stated that he "was the renter and left us his phone number." Pauli explained that the company's business practice when a call or voicemail is received is to document the information into a specially designed property management computer program. She testified that all employees are aware of this policy and Deborah Thomas, an administrative assistant, entered defendant's call into the program.

## II. BUSINESS RECORDS

On appeal, defendant makes several hearsay and MRE 803(6) challenges to the admission of Pauli's testimony. Defendant objected at trial on hearsay grounds, thereby preserving that issue. However, he failed to raise the MRE 803(6) challenge that he raises on appeal, leaving that issue unpreserved. See *Mouzon v Achievable Visions*, 308 Mich App 415, 419; 864 NW2d 606 (2014), quoting *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007).

A trial court's decision whether to admit or exclude evidence is reviewed for an abuse of discretion. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "If the court's evidentiary error is nonconstitutional and preserved, then it 'is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative'—i.e., that 'it undermined the reliability of the verdict.' " *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (quotation marks and citations omitted). To the extent that defendant's arguments are unpreserved, they are reviewed for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Hearsay is a statement (oral or written), "other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801. Generally, hearsay is not admissible unless it falls within an exception. MRE 802; *Merrow v Bofferding*, 458 Mich 617, 626; 581 NW2d 696 (1998). "It is well established that the proponent of evidence 'bears the burden of establishing [its] admissibility.' " *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004), quoting *People v Crawford*, 458 Mich 376, 388 n 6; 582 NW2d 785 (1998). When evidence contains hearsay within hearsay, the proponent must establish that both layers fall within an exception to the hearsay rule in order to be admissible. *Maiden v Rozwood*, 461 Mich 109, 125; 597 NW2d 817 (1999).

In this case, defendant concedes that his phone call to the company would be admissible against him as an admission by a party-opponent. MRE 801(d)(2). Defendant's arguments involve the second-layer of hearsay, specifically the recording of that phone call in the company's computer program. Defendant principally complains that the prosecutor did not offer into evidence the computer program printout reflecting Thomas's entry about defendant's phone call. Pauli only testified about the contents of the printout. This omission was never raised at trial and we conclude that, even if it was erroneous, it did not affect defendant's substantial rights.

If the prosecutor had moved to admit the printout, it would have been admissible— contrary to defendant's other chief complaint regarding this evidence. MRE 803(6) requires a qualified witness to testify that the record sought to be entered: (1) was made at or near the time in question; (2) by or from information transmitted by a person with knowledge; and (3) in the course of a regularly conducted business activity. Pauli testified that the company received a call on September 22, 2014. She further testified that it is the policy for employees to record calls and voicemails received "when they . . . receive a call." Therefore, the trial court could properly conclude that the record was made at or near the time of defendant's phone call. In addition, Pauli testified that it is the company's policy for employees to input information into the system when they receive it and Thomas is the employee who made the entry. Therefore, the trial court could properly conclude that the record was made by a person with knowledge. Finally, contrary to defendant's argument on appeal, the trial court could properly conclude that this record was made in the course of regularly conducted business activity because Pauli testified that employees make the records for every call or voicemail received by the company and the computer program is designed specifically to manage such records.

Defendant claims that the printout would not have been admissible because Pauli, not Thomas, testified regarding its foundation. But the plain language of MRE 803(6) specifically allows for either a custodian or other qualified witness to testify. Defendant acknowledges that Pauli was the director of operations for the management company and its sister companies. She testified that she oversees all of the employees and business practices to ensure "everything's running smoothly, making sure everybody's doing what they are supposed to be doing." She also testified that she was personally able to retrieve the printout relevant to this case from her companies' computer program. Therefore, the trial court could conclude that she was qualified to testify about the printout.

Although defendant complains that no evidence was offered to establish the trustworthiness of the printout, the printout was admissible "*unless* the source of information or

-3-

the method or circumstances of preparation indicate lack of trustworthiness." MRE 803(6) (emphasis added). No facts demonstrate a lack of trustworthiness. All employees make similar entries for all calls received. Pauli testified that Thomas followed the correct procedure with respect to defendant's call.

Pauli testified comprehensively about the contents of the printout. Defendant did not complain at trial, or on appeal, that Pauli's testimony conflicted with the printout. Because the printout would have otherwise been admissible under the business record exception, MRE 803(6), any error related to the failure to actually admit the printout into evidence did not affect defendant's substantial rights.

Moreover, contrary to defendant's argument on appeal, even without Pauli's testimony that demonstrated that defendant lived at the Elkhart house and had the same phone number as the phone recovered during the search, the outcome would have been the same. The jury could infer that defendant had dominion and control over the contents of the house from the police testimony that he put out the trash, which contained traces of suspected marijuana, several weeks before the search, and moved freely in and out of the house thereafter. See *People v McKinney*, 258 Mich App 157, 165-166; 670 NW2d 254 (2003). In addition, on the morning of the search, Washington testified that defendant sold her marijuana inside the Elkhart house. Defendant attacks Washington's credibility, but Detective-Lieutenant Stager similarly saw defendant conduct an apparent narcotics sale less than an hour before the search. The jury could infer that defendant was alone in the house with the drugs when the police knocked to conduct the search. When the police went inside, nobody was there. Defendant demonstrated his consciousness of guilt by jumping out of a bedroom window, ignoring police commands, and attempting to flee. In his haste, defendant also abandoned his phone, which was charging in the living room near marijuana, packaging materials, a scale, and handgun. Defendant's fingerprint was on one of the bags containing dime bags of marijuana. Defendant attempts to disentangle himself from the phone, but Washington testified that defendant gave her that phone number to reach him and the prosecution offered into evidence pictures of defendant stored on the phone. Given all of this evidence, Pauli's testimony was not outcome determinative. It was not necessary to enable the jury to find that defendant knew about the marijuana and had the right to exercise dominion and control over it. Defendant argued below, as he does on appeal, that others could have possessed the marijuana, but possession can be joint, *People v Wolfe*, 440 Mich 508, 519-521; 489 NW2d 748, amended 441 Mich 1201 (1992), and in any event defendant was the only person observed conducting drug transactions and fleeing from the Elkhart house at the time the marijuana was recovered. Defendant cannot establish error requiring reversal with respect to Pauli's testimony.

III. PRV 5

Defendant argues that the trial court improperly scored PRV 5 at 10 points instead of five points. We agree.

In *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), our Supreme Court clarified both the quantum of evidence necessary to support a scoring decision and the standard of review to be used by this Court:

Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.

PRV 5 is scored 10 points if an "offender has 3 or 4 prior misdemeanor convictions or prior misdemeanor juvenile adjudications," MCL 777.55(1)(c), or five points if an "offender has 2 prior misdemeanor convictions or prior misdemeanor juvenile adjudications," MCL 777.55(1)(d). "A prior misdemeanor conviction may be scored only 'if it is an offense against a person or property, a controlled substance offense, or a weapon offense.'" *People v Maben*, 313 Mich App 545, 549; 884 NW2d 314 (2015), quoting MCL 777.55(2)(a). For purposes of PRV 5, this Court looks to the Presentence Investigation Report (PSIR) and the prior offense to determine whether it was an offense against a person or property, a controlled substance offense, or a weapon offense. *People v Crews*, 299 Mich App 381, 397-398; 829 NW2d 898 (2013).

The PSIR lists numerous non-felony convictions, but the prosecutor conceded that she had only verified four, and the trial court only considered those convictions in scoring PRV 5. Defendant agrees that his two prior misdemeanor convictions for possession of marijuana were properly considered. He challenges the trial court's consideration of a license violation under MCL 257.324, and a disorderly person conviction under MCL 750.167(1)(f).

## A. LICENSE VIOLATION

MCL 257.324 governs violations of operator's license provisions and prohibits, in relevant part, the following activities:

> (a) Display, or cause or permit to be displayed, or have in possession an operator's or chauffeur's license knowing the operator's or chauffeur's license to be fictitious or to have been canceled, revoked, suspended, or altered.

> (b) Lend to or knowingly permit use of, by one not entitled to its use, the operator's or chauffeur's license issued to the person lending or permitting the use of the operator's or chauffeur's license.

> (c) Display or to represent as one's own any operator's or chauffeur's license not issued to the person displaying the operator's or chauffeur's license.

> (d) Fail or refuse to surrender to the department upon demand, any operator's or chauffeur's license which has been suspended, canceled, or revoked as provided by law.

> (e) Use a false or fictitious name or give a false or fictitious address in an application for an operator's or chauffeur's license, or any renewal or duplicate of an operator's or chauffeur's license, or knowingly make a false statement or knowingly conceal a material fact or otherwise commit a fraud in making an application.

(f) Alter or otherwise cause to be altered any operator's or chauffeur's license so as to knowingly make a false statement or knowingly conceal a material fact in order to misrepresent as one's own the operator's or chauffeur's license.

(g) Use or have in possession in committing a crime an operator's or chauffeur's license that has been altered or that is used to knowingly make a false statement or to knowingly conceal a material fact in order to misrepresent as one's own the operator's or chauffeur's license.

(h) Furnish to a peace officer false, forged, fictitious, or misleading verbal or written information identifying the person as another person, if the person is detained for a violation of this act or of a local ordinance substantially corresponding to a provision of this act.

(i) Commit fraud related to the testing for or issuance of a commercial driver license or permit.

(j) Fail to schedule a retest appointment within 30 days after receiving the secretary of state's retest notification.

It is unclear from the record exactly which subsection served as the basis of defendant's conviction, but the prosecutor stated that the offense was for "forgery or alteration of a false ID." No specific facts were provided about the case to classify it as an offense against a person or property, a controlled substance offense, or a weapon offense. Moreover, as defendant argues, the statutory language does not involve controlled substances or weapons, and it does not prohibit conduct against a person or property. Rather, we agree with defendant that these license violations are part of the Motor Vehicle Code and involve public order. The trial court erred when considering the license violation to score PRV 5.

## B. DISORDERLY PERSON (INDECENT OR OBSCENE CONDUCT)

The limited facts available fail to establish that defendant's disorderly person conviction should be classified as an offense against a person or property, a controlled substance offense, or a weapon offense. The record only demonstrates that defendant was "urinating or defecating" in a public place. There is no indication that anyone was exposed to defendant's conduct or whether property was damaged. Moreover, nothing in the plain language of MCL 750.167(1)(f) ("[a] person who is engaged in indecent or obscene conduct in a public place") triggers a person, property, controlled substance, or weapon classification. Although MCL 750.167(1)(f) requires the offense to occur in a public place, it does not, for example, require the indecent or obscene conduct to be directed against a person or property. Cf. MCL 750.167(1)(l) ("[a] person who is found jostling or roughly crowding *people* unnecessarily in a public place") (emphasis added). The trial court erred when considering the disorderly person conviction to score PRV 5.

The trial court scored a total of 50 PRV points and six OV points, placing defendant in PRV Level E (50-74 points) and OV Level I on the Class F Grid, resulting in a sentencing guidelines range of 5 to 46 months.[1]  If PRV 5 had been properly scored at five points, instead of 10 points, defendant would have had a total of 45 PRV points, placing him in PRV Level D (25-49 points) and OV Level I, with an enhanced guidelines range of 2 to 34 months.  Because the scoring error affects defendant's guidelines range, we vacate defendant's sentence and remand for resentencing.  See *People v Francisco*, 474 Mich 82, 89-90; 711 NW2d 44 (2006).

We affirm defendant's conviction, but remand for resentencing.  We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto

---

[1] Although the guidelines range for an E-I offender is 5 to 23 months, because defendant was sentenced as a fourth-offense habitual offender, the upper limit of his range was increased by 100%, MCL 777.21(3)(c), resulting in an enhanced guidelines range of 5 to 46 months.